## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

SCOTT KETTLES,

        Plaintiff,

vs                            Case No: 5:19-cv-13808-JEL-RSW

NEW CENTER STAMPING, INC.        Hon. Judith E. Levy

        Defendant.               Mag. Judge R. Steven Whalen

---

Scott Batey (P54711)
Ryan T, Fowler
Batey Law Firm, PLLC
Attorneys for Plaintiff
30200 Telegraph Road, Suite 400
Bingham Farms, MI 48025
248-540-6800 - telephone
248-540-6814 - fax
sbatey@bateylaw.com
rfowler@bateylaw.com

John J. O'Shea (P52009)
Law Office of John J. O'Shea, P.L.C.
Attorney for Defendant
18000 Mack Avenue
Grosse Pointe, MI 48230
313-884-2000 – telephone
313-884-2265 – fax
oshealaw@att.net

---

### DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

Defendant New Center Stamping, Inc. ("Defendant") submits the following Motion for Summary Judgment.

1.      This Motion is brought pursuant F.R.C.P. 56(b) and (c).

2.      Pursuant to Local Rule 7.1, counsel for Defendant requested concurrence in the relief requested in this Motion from Plaintiff's counsel, which consent was denied.

3.      Plaintiff was employed by Defendant.

4.      Plaintiff was terminated by Defendant for legitimate, non-discriminatory reasons.

5.      Plaintiff filed a complaint alleging that he was terminated because he complained about Defendant's plan to systematically terminate African American employees.

6.      Plaintiff, a Caucasian, has absolutely no evidence to support his claim, and fails to state a prima facie case for Retaliation.

7.      Plaintiff also has no evidence that Defendant's legitimate, non-discriminatory reasons for terminating Plaintiff were a pretext.

8.      Plaintiff's Complaint should be dismissed with prejudice.

9.      Defendant submits the attached Brief in further support of its Motion.

### *RELIEF REQUESTED*

Defendant New Center Stamping, Inc. requests that this Court grant its Motion for Summary Judgment pursuant to F.R.C.P. 56(b) and (c), and dismiss Plaintiff's

Complaint in its entirety against Defendant with prejudice.

Respectfully Submitted:

LAW OFFICE OF JOHN O'SHEA, P.L.C.

By:   /s/ John J. O'Shea_____
       John J. O'Shea (P52009)
       Attorney for Defendant
       18000 Mack Avenue
       Grosse Pointe, MI 48230
       313-884-2000
       oshealaw@att.net

Dated:   March 15, 2021

### DEFENDANT'S BRIEF IN SUPPORT
### OF ITS MOTION FOR SUMMARY JUDGMENT

---

Defendant New Center Stamping, Inc. submits the following Brief in Support of its Motion for Summary Judgment.

## *STATEMENT OF ISSUES PRESENTED*

I.   WHETHER PLAINTIFF STATES A PRIMA FACIE CASE FOR UNLAWFUL RETALIATION.

Movant Answers:  No.

II.   WHETHER DEFENDANT HAS IDENTIFIED SEVERAL LEGITIMATE, NON-DISCRIMINATORY REASONS FOR PLAINTIFF'S TERMINATION.

Movant Answers:  Yes.

III.   WHETHER PLAINTIFF HAS ANY EVIDENCE THAT DEFENDANT'S PROFERRED REASONS FOR TERMINATION WERE FALSE AND A MERE PRETEXT FOR DISCRIMINATION.

Movant Answers:  No.

IV.   WHETHER DEFENDANT IS ENTITLED TO JUDGMENT AS A MATTER OF LAW AND DISMISSAL OF PLAINTIFF'S COMLAINT WITH PREJUDICE.

Movant Answers:  Yes.

## *CONTROLLING OR MOST APPROPRIATE AUTHORITY*

F.R.C.P. 56(b) and (c)

Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)

Chappell v. GTE Prods. Corp., 803 F.2d 261 (6th Cir. 1986)

Ford v. Securitas Sec. Servs. USA, Inc., 338 F. App'x 483 (6th Cir. 2009)

Jackson v. Quanex Corp., 191 F.3d 647 (6th Cir. 1999)

Laster v. City of Kalamazoo, 746 F.3d 714 (6th Cir. 2014)

McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)

Plant v. Morton Int'l., Inc., 212 F.3d 929 (6th Cir. 2000)

Rogers v. Henry Ford Health Sys., 897 F.3d 763 (6th Cir. 2018)

Weigel v. Baptist Hosp., 302 F.3d 367 (6th Cir. 2002)

# I.

## *STATEMENT OF UNDISPUTED FACTS[1]*

1.    Plaintiff Scott Kettles was an employee of Defendant New Center Stamping, Inc. ("Defendant").

2.    Plaintiff is Caucasian.

3.    Plaintiff was hired by Defendant on September 26, 2018 as a Maintenance Facilities Manager. Plaintiff's Complaint, Exhibit 1 at ¶7.

### A.    Plaintiff's Complaint/Allegations/Deposition Testimony

4.    Plaintiff alleges that on or about March 15, 2019, Defendant's Director of Manufacturing Gary Looker called a plant wide meeting and referred to the entire staff, predominately African American, as "you people." Id. at ¶9.

5.    Plaintiff testified that he believed the term "you people" to be racist, but admitted that he "has no way of proving that." Plaintiff's Deposition, Exhibit 2, pg. 85.

6.    In or around the beginning of April 2019, Plaintiff alleges in his Complaint that Looker told Plaintiff that "he was going to get rid of all the G—damn fuc--ng n****ers, we did the same thing at Tranor Company." Exhibit 1 at ¶10.

---

[1] This Statement of Undisputed Facts contains certain facts alleged by Plaintiff which Defendant disputes, but which are taken as true for purposes of this Motion only.

7.    Plaintiff admits that he never put this alleged despicable statement in writing to anyone. Exhibit 2, pg. 94.

8.    Plaintiff also testified that he did not contact Human Resources about this alleged despicable statement because "the chain of command was compromised." Id. at pgs. 230-231.

9.    In fact, Plaintiff testified that he believed that Human Resources was somehow in on some conspiracy against him. Id.

10.    Rather than putting the statement in writing to anyone, or alerting Human Resources, Plaintiff instead alleges that he had a verbal conversation with Ray Fernandez, Defendant's President.

11.    On or about April 15, 2019, according to his Complaint, Plaintiff met with Mr. Fernandez to express his concerns about the "racist rhetoric" used by Looker. Exhibit 1 at ¶12.

12.    According to the Complaint, Mr. Fernandez doubled down on the racist remarks and told Plaintiff "he is going to remove the entitlement that these people think they have." Id. at ¶13.

13.    According to the Complaint, Plaintiff protested and informed Mr. Fernandez that he cannot make employment decisions based on race. Id. at ¶14.

14.     Plaintiff then alleges that Defendant ignored Plaintiff's complaints and proceeded to replace at least 30 African-American employees due to their race. Id. at ¶15.

15.     In his deposition, Plaintiff testified that, in the months of February, March and April, 2019, approximately sixty (60) African Americans were terminated due to their race. Exhibit 2, pgs. 105-106.

16.     However, in his deposition, Plaintiff, the Maintenance Facilities Manager, could only identify two (2) of the alleged sixty (60) African American employees terminated, Exhibit 2, pgs. 274-277, and none of the thirty (30) African Americans allegedly terminated because of their race referenced in Plaintiff's Complaint. Id. at pg. 101.

17.     Strangely, during that same time frame, even though he was Maintenance Facilities Manager, Plaintiff has no idea whether employees of any other ethnicities were terminated by Defendant. Id. at pg. 108.

18.     In sum, despite his outrageous allegations, Plaintiff is able to identify only two (2) African Americans he believes were improperly terminated by Defendant.

19.     Plaintiff estimated that by middle of March, 2019, approximately fifty percent (50%) of Defendant's workforce was Middle Eastern. Id. at pgs. 264, 266.

20.     Plaintiff identified people that were Middle Eastern by the "lack thereof of the ability to read and write English." Id. at pg. 264.

21.     Plaintiff alleges that he was terminated on May 9, 2019 due to his complaints that African Americans were being targeted. Exhibit 1 at ¶ 16.

22.     In his original Complaint, Plaintiff alleged both Racial Discrimination (Count I) and Retaliation (Count II). Id.

23.     On February 11, 2020, Plaintiff stipulated to dismissal with prejudice of Count I of the Complaint. ECF No. 7.

24.     Thus, Count II (Retaliation) is Plaintiff's only remaining claim in this case.

25.     Plaintiff admits that he has no evidence to support his allegation that he was terminated for retaliation for complaining about this alleged plot to terminate African Americans:

> Q.     Okay. But as you sit here today – and I understand we're going through the case and going through discovery – but as you sit here today, the only basis you have for claiming that you were terminated due to your complaints was the fact that you complained numerous times, and that you were terminated sometime thereafter, correct?
> A.     Yeah. That would be a true statement. Yes sir.
> Q.     Okay. Do you know why or have you an explanation as to why they didn't terminate you after the first time you complained.
> A.     I have no idea sir. I can't speak for other people, Mr. O'Shea. Respectfully meant. I just – I can't.

Exhibit 2, pgs. 237-238.

**B.**     **The Real Numbers on Terminations**

26.     Contrary to Plaintiff's Complaint and testimony, Defendant did not undertake some clandestine plan to terminate African Americans because of their race.

27.     By way of example, Ethelinds Henry is the African American Second Shift Supervisor for Defendant. Deposition of Ethelinds Henry, Exhibit 3, pg. 8.

28.     Ms. Henry testified that at no time did Defendant ever undertake any plan to get rid of African American employees. Id. at pg. 14.

29.     In fact, Ms. Henry testified that she had the authority to hire and fire people working for her on the Second Shift. Id. at pg. 26.

30.     She also testified the amount of African American employees working for her in 2018, 2019 and 2020 remained consistent, and that she only terminated employees based on performance, not race. Id. at pg. 26.

31.     Indeed, the actual numbers are dispositive about the absence of this alleged nefarious plan.

32.     Attached as Exhibit 4 is a list of all employees of Defendant who left Defendant's employ from June 29, 2018 through August 27, 2020 for any reason. See Exhibit 4.

33.     In March, 2019, at the height of Defendant's nefarious plan according to Plaintiff, not one African American was terminated for any reason. Id.

34.     In April, 2019, while the plan was still in effect according to Plaintiff, only three (3) African Americans were terminated: two (2) for Unsatisfactory Performance and one (1) for Working Under the Influence. Id.

35.     During that same month of April, 2019, one (1) Caucasian worker was also terminated for Unsatisfactory Conduct. Id.

36.     In May, 2019, the first individual terminated by Defendant was Plaintiff Scott Kettles, a Caucasian, on May 9, 2019. Id.

37.     Indeed, if one looks at the entire list of terminations of employment, for whatever reason, for the entire seven and one-half (7 1/2) month period Plaintiff worked for Defendant (9/26/18-5/9/19), the termination numbers are as follows:

A. Job Abandonment:  African Americans – 5
                     Caucasians – 3
B.  Unsatisfactory Conduct/Performance: African Americans – 2
                                        Caucasians – 1
C.  Resignation:  African Americans – 7
                  Caucasians – 7
D.  Laid Off:  African Americans – 11
               Caucasians – 5
               Hispanic – 1
E. Working Under the Influence: African Americans – 2

Exhibit 4.

**C.     The Reasons For Plaintiff's Termination By Defendant**

38.     Plaintiff is unable to keep a job.

39.     Prior to his hiring by Defendant, in the 14 or 15 years he worked for someone other than himself, Plaintiff had nine (9) different jobs. Exhibit 2, pgs. 250-252.

40.     In addition, after being terminated by Defendant, Plaintiff went to work for Flex-N-Gate in July 2019. Id. at pg. 23.

41.     Plaintiff lasted at Flex-N-Gate only about seven (7) weeks – he was terminated on August 26, 2019. Id. at pg. 23.

42.     Plaintiff was terminated from Flex-N-Gate based on performance. Id. at pg. 24.

43.     Plaintiff was only employed by Defendant for approximately seven and one-half (7 1/2) months.

44.     The President of Defendant, Mr. Fernandez, made the decision to terminate Plaintiff for numerous reasons.

### a. Intimidating/Threatening/Offending Women

45.     Plaintiff has a problem dealing with women who have authority.

46.     Tolaria Johnson, the African American female Controller for Defendant, was concerned for her safety around Plaintiff. See Affidavit of Tolaria Johnson, Exhibit 5.

47.     When Ms. Johnson was in the office in the evening after others had left, Plaintiff would sometimes walk over to the building where Ms. Johnson worked for no reason. Exhibit 5 at ¶9.

48.     On those occasions, Ms. Johnson would lock the building so Plaintiff could not enter. Id. at ¶10.

49.     Ms. Johnson even informed Chris Garvey, Defendant's CFO, that Plaintiff made her feel uncomfortable and that she would not hesitate to call the police if Plaintiff approached her in the evening when she was alone. Id. at ¶11.

50.     In addition to this behavior, Plaintiff would aggressively and intentionally "over-talk" Ms. Johnson when she was trying to communicate with him. Id. at ¶6.

51.     Also, as Controller, Ms. Johnson was responsible for knowing the whereabouts of any Managers at any given time. Id. at ¶3.

52.     Plaintiff did not believe Ms. Johnson had that right, and on one occasion screamed at Ms. Johnson "I don't care if Jesus tells me." Id. at ¶¶4,5.

53.     Ethelinds Henry, the African American Second Shift Supervisor, also felt uncomfortable around Plaintiff, and would intentionally insure she was not alone with him. Exhibit 3, pgs. 8,9.

54.     Ms. Henry testified that Plaintiff would stare at her like he was undressing her. Id.

11

55.     Plaintiff would also ask her to go for rides in his car which also made her feel uncomfortable. Id. at pgs. 9-10.

56.     In fact, Ms. Henry complained to Mr. Looker when Plaintiff followed her home one night. Id. at pg. 24

57.     Ruth Warhurst has worked for Defendant for approximately 26 years and is the Director of Human Resources for Defendant. Deposition of Ruth Warhurst, Exhibit 6, pg. 5-6.

58.     Ms. Warhurst had several run-ins with Plaintiff.

59.     On one occasion, Plaintiff screamed at Ms. Warhust after she refused to fire someone at his command. Id. at pg. 26.

60.     Ms. Warhust was "definitely scared" by Plaintiff. Id.

61.     On another occasion, Plaintiff confronted Ms. Warhurst about an insurance issue. Id. at pg. 23.

62.     During that conversation, witnessed by Tolaria Johnson, Plaintiff "went on a rampage" against Ms. Warhurst which was "absolutely over the top and out of control." Exhibit 5 at ¶12.

63.     After that meeting, Plaintiff wrote the following threatening email to Ms. Warhust:

> You don't understand anything, YOUR behavior is unacceptable. I will not tolerate this, you spoke openly in front of the entire front office, all of which is confidential.
> I have nothing to say to you, for the extent of my employment here.

<u>See</u> Exhibit 7 (capitalization in original).

64.     Angela Russo, Defendant's Director of Quality, also testified that Plaintiff repeatedly refused to answer her questions with any specificity (unlike his responses to male Managers), made false accusations against her and made her feel very uncomfortable in his presence including asking him to take a drive with her in his car. <u>See</u> Exhibit 8.

65.     Mr. Fernandez was aware of these complaints.

66.     He testified as follows:

Q.     At the bottom of paragraph 2 you say Mr. Kettles chooses not to follow processes, he is constantly swimming out of his lane, and he's gotten into arguments and in some cases threatened Ruth, Mary, Tolaria, Sarah and Angela; is that correct?
A.     Yes, that's right.
Q.     Who told you he threatened those women?
A.     All of those women continuously complained to me about Scott. They were afraid of him.
Q.     They were afraid of him?
A.     Yes. That's what they told me.
Q.     Tolaria is the controller, correct?
A.     Yes.
Q.     Did she complain to you personally?
A.     She did. For the record, I'd like to tell you that Tolaria was afraid. We worked in the administration building, which is adjacent to the plant on the other side of the parking lot.

        Tolaria and I would often work late. There is the guard at the door in the parking lot. I believe he left at 5:00. And Tolaria would always tell me, always, please, you know, make sure – I saw Kettles' car in the parking lot, please make sure the door is locked; I don't want him in here while I'm in here alone.

Exhibit 9, pgs. 44-45.

67.     Plaintiff admits that Mr. Fernandez informed him that Mr. Fernandez had received complaints from *all* the salary staff about Plaintiff. Exhibit 2, pg. 144.

68.     However, Plaintiff testified that he never asked Mr. Fernandez who complained because he "didn't care." Id. at pgs. 145-146.

### D.     Mr. Fernandez's Decision To Terminate Plaintiff

69.     Mr. Fernandez decided to terminate Plaintiff as of March 19, 2021. Exhibit 9, pg. 57.

70.     On that day, March 19, 2021, Mr. Fernandez wrote an email to Ed Schwartz,  his supervisor, which read in pertinent part:

Ed,

I am aware of this matter, Mr. Benson is hearing this from Scott Kettles. Scott has no authority over our die setters, we have plenty of die setters. . .

All of our hiring, disciplinary actions and terminations are done in coordination with our HR department (Ruth), that includes interaction with recruiters. Scott chooses not to follow process, he is constantly swimming out of his lane and loves to stir the pot. Recently we called people we know at Scott's last two employers because we have been observing unusual behavior; at both places he was accused of theft (scrap) and of not being capable of working with female managers. In his time here he has gotten into arguments (yelling) and in some cases threatened Ruth, Mary, Tolaria, Sara and Angela. We are also investigating a scrap theft incident.

Our team has been working with the Soave recruiting team to find a replacement for Scott. We are very pleased that the Soave team has produced twelve candidates. The interview process has started, some of the candidates are very promising. We hope to have a replacement in the next 2-3 weeks.

Mr. Benson may be doing Scott a favor by finding him a job.

Exhibit 10.

71.     Thus, it is undisputed that Mr. Fernandez decided to terminate Plaintiff before 1) Gary Looker allegedly made his racist statement in early April; and 2) before Plaintiff allegedly complained to Mr. Fernandez on April 15, 2019 about Mr. Looker's alleged racist statement.

72.     Even after Mr. Fernandez decided to terminate Plaintiff as of March 19, 2019, and began looking for his replacement, Plaintiff continued to give Mr. Fernandez additional reasons for termination.

73.     On March 28, 2019, Plaintiff took it upon himself to again "swim out of his lane" and negotiate lease terms which he had no authority to do.

74.     On March 28, 2019, Plaintiff emailed the landlord of a building Defendant was using, with a copy to Mr. Fernandez and Defendant's CFO, Mr. Garvey, confirming a purported lease agreement. See Exhibit 11.

75.     *Six (6) minutes later*, Mr. Fernandez  responded to Plaintiff stating:

You are not authorized to make this commitment. We are considering a variant of this proposal. Soave executives will have to approve and be directly involved. You need to retract your email immediately.

Exhibit 11.

76.     At the exact same time, six (6) minutes after Plaintiff sent his email, Mr. Garvey responded to the landlord as follows:

Unfortunately Scott has overstepped. He does not have the authority to enter into any such arrangement. Please disregard his email. We have not

approved the draft lease much less any addendum to space usage and rates. We recognize the need to address this in a reasonable and timely manner and I agree we need to sit down soon to discuss. Sorry for any confusion.

Exhibit 11.

77.    Mr. Fernandez terminated Plaintiff for all the reasons set forth above.

Exhibit 9, pgs. 57-58.

78.    However, Plaintiff's final, stunning terminable offense came when

Plaintiff reduced an employee, Frank Garrett, an older African American employee,

to tears because of his bullying tactics.

79.    Mr. Fernandez testified as follows:

But the straw that broke the camel's back for me was when there was an altercation in the plant with Frank Garrett. There was a press that needed to be fixed. It was urgent, because we had to start production.

Kettles apparently threatened Frank. And to make a long story short, Frank came into my office with Ruth. And Frank is an African American employee. I believe the only African American on Kettles' team. And he is a legacy employee at New Center Stamping. He's been there a very long time. He is a valuable employee because he has a history with the presses in that facility. He's very valuable to us. It's very old equipment.

And what I am about to tell you, I will never forget this. Frank is an older gentleman, a strong guy. He sat in my office shaking. Shaking and crying. And no person deserves to be abused like that. Nobody.

And at that point I tried to calm him down. I asked him to go home, that he needed to calm down. And I assured him that he was not going to lose his job, that he was a valuable asset to our company.

He left my office. I said okay, the buck stops here, I'm firing Kettles right now.

Exhibit 9, pgs. 58-59.

80.    Mr. Garrett confirms that, as a result of Plaintiff's brutal and unfair treatment, he went to Mr. Fernandez's office where he broke down, crying and shaking, saying that he could no longer work with Plaintiff. Exhibit 12.

81.    Plaintiff admits that he has no evidence of any kind that the meeting between Mr. Garrett and Mr. Fernandez did not occur exactly as those two (2) have testified. Exhibit 2, pg. 177.

82.    Mr. Fernandez immediately terminated Plaintiff that day. Exhibit 9, pgs. 59-60.

83.    So, Mr. Fernandez, who supposedly was undertaking a secret plan to rid Defendant's facility of African Americans, a plan utterly and entirely fabricated as laid bare by the indisputable employment termination numbers, comforted the African American employee and properly terminated the Caucasian employee.

## II.

### ARGUMENT

### NO GENUINE ISSUE OF MATERIAL FACT EXISTS AND DEFENDANT IS ENTITLED TO JUDGMENT AS A MATTER OF LAW.

A.   <u>Summary Judgment Standard.</u>

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."  F.R.C.P. 56(c).   The moving party bears the initial burden of showing the absence of a genuine issue of material fact.  <u>Plant v. Morton Int'l., Inc.</u>, 212 F.3d 929, 934 (6th Cir. 2000).   Once the movant has satisfied its burden, the moving party must produce evidence showing that a genuine issue remains.  <u>Id.</u>   Summary judgment is proper when the non-moving party has had adequate time for discovery, and yet fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  <u>Celotex Corp. v. Catrett</u>, 477 US 317, 322, 106 S.Ct. 2548, 91 L.Ed 2d 265 (1986).

B.   <u>Retaliation Claim.</u>

Claims of alleged retaliation brought under Michigan's Elliott-Larsen Act are considered under the same standards as claims under Title VII. <u>Jackson v. Quanex</u>

Corp., 191 F.3d 647, 658 (6th Cir. 1999). If the plaintiff only has circumstantial evidence of retaliation, the McDonnell Douglas burden-shifting framework applies. Under that framework, plaintiff must first make out a prima facie case of retaliation. Then, the burden shifts to the employer to proffer a legitimate, nonretaliatory reason for its decision. If the employer does so, plaintiff must prove by a preponderance of the evidence that the reason offered by the employer were pretextual. Rogers v. Henry Ford Health Sys., 897 F.3d 763, 771-772 (6th Cir. 2018).

To establish a prima facie case of retaliation a plaintiff must establish that 1) he was engaged in a protected activity; 2) his exercise of such protected activity was known by the defendant; 3) thereafter, the defendant took an action that was materially adverse to the plaintiff; and 4) a causal connection existed between the protected activity and the materially adverse action. Laster v. City of Kalamazoo, 746 F.3d 714, 730 (6th Cir. 2014).

If Plaintiff establishes a prima facie case, the burden shifts to Defendant to articulate a legitimate non-discriminatory reason for Plaintiff's discharge. McDonnell Douglas, 411 U.S. at 802-03.  Once Defendant makes that showing, Plaintiff is required to show that the articulated reason was a pretext for retaliation. Id. at 804.  Plaintiff must produce evidence sufficient that a reasonable finder of fact could reject the employer's proffered reason. Rogers, 897 F.3d at 777. Pretext can be demonstrated three ways: by showing that the proffered reason 1) has no basis in

19

fact; 2) did not actually motivate the defendant's challenged conduct, or 3) was insufficient to warrant the challenged conduct. Id.

Plaintiff fails to state a prima facie case of race discrimination. He does not allege any direct evidence of discrimination. He also has absolutely no evidence that any "causal connection" exists between his alleged "protected activity" and his termination.[2] Indeed, it is fatal to Plaintiff's claim that it is undisputed that Mr. Fernandez made the decision to terminate Plaintiff as of March 19, 2019, several weeks before, by Plaintiff's own Complaint and testimony, Plaintiff (1) ever heard Mr. Looker make his alleged racist statement and (2) complained of those alleged statements to Mr. Fernandez. Thus, there is absolutely no evidence of a causal relationship. In fact, the undisputed evidence is that there was none. Defendant's Motion should be granted on this basis alone.

Should the Court undertake the McDonnell Douglas analysis, Defendant has demonstrated numerous legitimate, non-discriminatory reasons for Plaintiff's termination. The burden of proving a legitimate, nondiscriminatory reason is not high. Ford v. Securitas Sec. Servs. USA, Inc., 338 F. App'x 483, 489 (6th Cir. 2009). Defendant only bears the burden of production; the burden of persuasion is with

---

[2] Again, Defendant denies that Plaintiff ever engaged in any "protected activity" of any kind and contends that his unsupported allegations of alleged statements, nowhere in writing, are false. However, for purposes of this Motion only, Defendant accepts those allegations as true.

plaintiff at all times. <u>Weigel v. Baptist Hosp.</u>, 302 F.3d 367, 377 (6th Cir. 2002). Once the defendant has articulated a nondiscriminatory reason for its decision, the presumption of discrimination that arises from the plaintiff's prima facie case disappears and the plaintiff must have the opportunity to show that the defendant's proffered explanation is merely a pretext for discrimination. <u>Id</u>. <u>See also</u> <u>Chappell v. GTE Prods. Corp.</u>, 803 F.2d 261, 266 (6th Cir. 1986) (a defendant need not persuade the court that it was actually motivated by the proffered reasons, but need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus).

Plaintiff is a bully and cannot get along with anyone, particularly women in authority. At least four (4) women, including two (2) women of color, which Plaintiff contends to be so concerned about, complained about Plaintiff. Plaintiff creeped them out, made them feel uncomfortable, undressed them with his eyes, approached them alone and at night, followed them home, talked over them, lied about them, and threatened them. Mr. Fernandez received these complaints from these women. Plaintiff admits that Mr. Fernandez told him that he had received complaints about Plaintiff from *all* salary personnel. Plaintiff's response: he did not even ask Mr. Fernandez who complained because he "didn't care." Exhibit 2, pgs. 145-146.

21

In addition, Plaintiff was constantly "swimming out of his lane." As set forth on Exhibit 10, Plaintiff improperly tried to hire die setters for whom he possessed no hiring authority in March 2019. Also, Mr. Fernandez was told that Plaintiff had been accused of theft, and of not being capable of working with female managers, at his last two (2) employers. Exhibit 10. This, of course, came as no surprise to Mr. Fernandez as Defendant's female managers had similarly complained to him about Plaintiff.

At this point, as of March 19, 2019, Mr. Fernandez decided to terminate Plaintiff once a replacement had been found. Subsequent to that decision, Plaintiff continued to give Mr. Fernandez additional reasons to terminate him. About a week after Mr. Fernandez decided to terminate Plaintiff for, in part, "constantly swimming out of his lane," Plaintiff did it again by negotiating a lease with no authority to do so. Mr. Fernandez reprimanded Plaintiff six (6) minutes after learning of Plaintiff's improper actions. Likewise, Mr. Garvey had to immediately contact the landlord and apologize for Plaintiff's improper actions.

But, as Mr. Fernandez testified, the "straw that broke the camel's back" was Plaintiff's abusive treatment of Frank Garrett. Plaintiff threatened Frank Garrett, Plaintiff's only African American employee, and caused him to go to Mr. Fernandez's office, where he broke down and started shaking and crying because of Plaintiff's treatment of him. Mr. Garrett told Mr. Fernandez he could no longer work

for Plaintiff. As Mr. Fernandez testified, he would "never forget" seeing an older, strong man break down and cry and shake in his office because of the bullying treatment at the hands of Plaintiff. As Mr. Fernandez testified, "no person deserves to be abused like that. Nobody." Exhibit 9, pgs. 58-59. Mr. Fernandez properly immediately terminated Plaintiff for his egregious actions.

In sum, Plaintiff was terminated for a host of legitimate reasons. Each reason, on its own, constitutes a legitimate reason to terminate, requiring dismissal of Plaintiff's Complaint. Taken together, they constitute a mountain of undisputed legitimate reasons insurmountable to Plaintiff's case.

Finally, Plaintiff does not have any evidence that the above reasons were pretexts for his termination and that the real reason for his termination was that he complained to Mr. Fernandez on April 15, 2019 about a systematic plan to rid Defendant's facility of African Americans. First, it is undisputed that Mr. Fernandez made the decision to terminate Plaintiff as of March 19, 2019, approximately one (1) month before Plaintiff ever allegedly complained to Mr. Fernandez.  Second, Plaintiff cannot dispute that he was properly terminated. For example, Plaintiff has no basis to in any way dispute the Frank Garrett incident. Exhibit 2, pg. 177. That was the dramatic and final reason Mr. Fernandez could no longer justify securing Plaintiff's replacement prior to terminating Plaintiff. Reducing a long time, long valued employee to tears and shaking is completely unacceptable and is a basis for

termination. Plaintiff cannot dispute it happened, and cannot dispute Mr. Fernandez considered that "the straw that broke the camel's back" regarding Plaintiff's employment; this was merely the final reason for his termination, in addition to all the other reasons.

It is also important to note that Plaintiff has no evidence of this alleged nefarious plan he claims Defendant instituted. Plaintiff boldly testified in his deposition that Defendant terminated approximately sixty (60) African American employees in a three (3) month span. Plaintiff could only name two (2), which is consistent with the actual numbers provided by Defendant. Exhibit 4. In fact, Exhibit 4 demonstrates that Defendant does not discriminate against any employee and that no ethnic or racial group is treated differently in any way.

Plaintiff believes that he does no wrong, and everyone else is at fault. He believes that of every employer he works for. That is why he has had nine (9) jobs in fourteen (14) years before joining Defendant, and was fired by Flex-N-Gate after only seven (7) weeks after being terminated from Defendant. He is also a con man and a fraud. He comes to this Court claiming to be some great protector and self-appointed guardian of African Americans. Yet, the African Americans he worked with (Tolaria Johnson, Ethelinds Henry, Frank Garrett), he intimidated, mistreated. and caused them to break down, shake and cry. Again, Plaintiff is simply a bully and, quite possibly, worse.

24

Defendant did not unlawfully discriminate against Plaintiff. He was terminated for numerous legitimate reasons. No reasonable juror would ever conclude otherwise.

### RELIEF REQUESTED

Defendant New Center Stamping, Inc. requests that this Court grant its Motion for Summary Judgment pursuant to F.R.C.P. 56(b) and (c), and dismiss all Plaintiff's Complaint in its entirety against Defendant with prejudice.

Respectfully Submitted:

LAW OFFICE OF JOHN O'SHEA, P.L.C.

By:  /s/ John J. O'Shea
     John J. O'Shea (P52009)
     Attorney for Defendant
     18000 Mack Avenue
     Grosse Pointe, MI 48230
     313-884-2000
     oshealaw@att.net

Dated:   March 15, 2021

## *CERTIFICATE OF SERVICE*

I hereby certify that on March 15, 2021, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to all parties of record.

/s/ John J. O'Shea
John J. O'Shea (P52009)
Attorney for Defendant
18000 Mack Avenue
Grosse Pointe, MI 48230
313-884-2000
oshealaw@att.net